UNITED STATES of America, Appellee,

v.

Vincent PAPA, Defendant-Appellant.

No. 267, Docket 75–1208.

United States Court of Appeals,
Second Circuit.

Argued Sept. 23, 1975.
Decided April 2, 1976.

Ivan S. Fisher, New York City (Fisher, Rosner & Scribner, New York City, on the brief, Jeffrey Dwight Ullman, New York City, of counsel), for defendant-appellant.

Daniel J. Beller, Asst. U.S. Atty., New York City (Paul J. Curran, U.S. Atty., S.D. N.Y., John P. Cooney, Jr., and John C. Sabetta, Asst. U.S. Attys., New York City, of counsel), for appellee.

Before FRIENDLY, HAYS and FEINBERG, Circuit Judges.

HAYS, Circuit Judge:

Defendant, Vincent Papa, Sr., appeals from a judgment of conviction after a jury trial in the United States District Court for

the Southern District of New York. Papa was convicted on a two count indictment of conspiring to traffic in narcotics and a substantive violation of the narcotics laws. Appellant's primary challenges to this conviction are bottomed upon the contention that his prosecution on the conspiracy count in the indictment below [hereinafter the "Southern District indictment"] is barred by conviction on a guilty plea to an earlier indictment brought in the Eastern District of New York [hereinafter the "Eastern District indictment"], and that both the conspiracy and substantive counts in the Southern District indictment are barred by promises attending the taking of that plea on the Eastern District indictment. Because we find that the two indictments charged appellant with distinct criminal offenses and that the plea bargain on the Eastern District indictment did not confer any immunity as to crimes charged in the Southern District indictment, we reject appellant's contentions. Since Papa's other claims of error are without merit, the conviction is affirmed.

### The Southern District Indictment

The Southern District indictment charged appellant and five others with violations of the federal narcotics laws. Count One charged Vincent Papa, Sr., Anthony Stanzione, Victor Euphemia, Jack Locorriere, Vincent Papa, Jr., and Peter Giamarino and "others to the Grand Jury known and unknown"[1] with a conspiracy to traffic in narcotics from September 1, 1967 through May 1, 1971, in violation of 21 U.S.C. §§ 173, 174, and with conspiring in violation of 21 U.S.C. § 846 to violate 21 U.S.C. §§ 812, 841,[2] from May 1, 1971 through November 18, 1974.[3] Count Two charged Papa and co-defendant Stanzione with the substantive offense of possession with intent to distribute 160 pounds of heroin on February 14, 1972, in violation of 21 U.S.C. §§ 812 and 841. The jury found Papa guilty on both counts.[4]

In broad outline, the proof at trial on the Southern District indictment revealed that the appellant was the top link, the director and source of supply, of the all too familiar chain conspiracy to traffic in narcotics. The next line, working directly below Papa, was, at various times, the wholesalers and co-defendants Stanzione, Euphemia, and Locorriere. These men made direct deliveries to unindicted co-conspirator Joan Moreland, a large retailer who served with her associates to link the heroin to Harlem's addict population. The wholesalers, at times, also used the services of "stash men," one of whom was Joseph Ragusa, who would, in turn, deliver the heroin to Moreland. This chain operated in New York City between 1967 and 1972.

Joan Moreland, who testified at trial as a Government witness, occupied her functional level from the inception of the conspiracy charged. In 1967 Moreland was introduced to Euphemia and Stanzione, who were then acting in partnership. During that year and continuing into 1968, they jointly served to supply Moreland. Deliveries were made in Manhattan. Although the Euphemia-Stanzione association dissolved some time in 1968, each of the former partners continued independently to trade with

---

1. In three bills of particulars 36 persons were named as co-conspirators. As will be developed more fully under the discussion of the Eastern District prosecution, only one of these named co-conspirators—Anthony Passero—was involved in the activities which gave rise to the Eastern District indictment.

2. 21 U.S.C. §§ 173, 174 were repealed by Pub.L. 91–513, title III, §§ 1101(a)(2), (4), October 27, 1970, 84 Stat. 1291, effective May 1, 1971. The repeal does not affect prosecutions for violations occurring prior to the effective date of the repeal. Pub.L. 91–513, § 1103(a).

21 U.S.C. § 841, Pub.L. 91–513, title II, § 401, October 27, 1970, 84 Stat. 1260, became effective on May 1, 1971. 21 U.S.C. § 846, Pub.L. 91–513, title II, § 406, October 27, 1970, 84 Stat. 1265 became effective on the same date.

3. The Government's proof with respect to the conspiracy count terminated in October, 1972, when Papa began serving his sentence under the Eastern District conviction.

4. Euphemia pleaded guilty and Vincent Papa, Jr. was acquitted. Stanzione and Locorriere were fugitives at the time of trial and Locorriere is believed to be dead. The jury was unable to reach a verdict as to Peter Giamarino.

Moreland. Stanzione furnished Moreland with heroin on a continuous basis through October, 1969, with delivery being accomplished at one of Moreland's apartments in Manhattan or at Stanzione's home or business, both of which were located in the Bronx. Euphemia's independent trade with Moreland continued through December, 1969, and occurred at various Manhattan locations. In December, 1969 Euphemia teamed up with Jack Locorriere, the operator of Ditmar's Private Car Service in Astoria, Queens, and introduced his new associate to Moreland. Thereafter, upon Euphemia's instruction, Locorriere and Moreland transacted business directly and used the Car Service as their focal point of contact.

It was through the Car Service that Joseph Ragusa, another principle government witness, became involved in this narcotics network. Locorriere hired Ragusa to work as a driver at the Car Service in the latter part of 1969 or early part of 1970. Soon after he was hired, the scope of Ragusa's employment was expanded. Ragusa agreed to stash and deliver heroin for Locorriere and was taught the art of cutting heroin by his employer. From the stashed heroin Ragusa made deliveries to Moreland and periodically made heroin pick-ups in Queens to replenish his supply. Ragusa, at times, would expropriate some of the stashed heroin to himself for sale to Moreland as his own.

On December 31, 1970, Locorriere telephoned Ragusa at the Car Service. Since then Locorriere has neither been seen nor heard from. Ragusa continued to sell the heroin he had remaining from the Locorriere stash to Moreland and embezzled some of the money intended for Locorriere which he collected from her. Ragusa then agreed with Euphemia that he would continue operating for Euphemia as he had for Locorriere. The agreement, however, lapsed early in 1971.

Around the time of the Ragusa-Euphemia agreement, Ragusa met appellant Papa. Papa came to the Car Service to retrieve the money Ragusa embezzled on the Locorriere stash sales to Moreland. Ragusa agreed to repay the money in installments and made the first payment at that time. The link between Locorriere and Papa as his supplier is thus evidenced by Papa's posture vis à vis Ragusa.

Ragusa failed to make additional payments to Papa. The two met again in January and agreed that Ragusa would work off the debt by stashing heroin for Papa. Papa introduced Ragusa to Stanzione. Stanzione delivered 160 pounds of heroin to Ragusa for storage in the latter's Long Island City home with the understanding, under instructions from Papa, that Stanzione would have access to the stash at all times. Ragusa, no longer trusted as a collection agent, was not to make any sales himself. Ragusa nevertheless surreptitiously sold some of the heroin in his custody to Moreland on his own account. Additionally, Moreland sought Ragusa out for more supplies. As to these Ragusa responded that he must get permission from "Vinnie" because "he's the boss. . . ." Ragusa met with Papa at the Astoria Colts Social Club in Queens, a gathering place for members of the conspiracy, and tried to arrange this additional sale to Moreland.

Meanwhile, Euphemia was supplying the Moreland account. At one point during the summer of 1971, Moreland was unable to make an expected payment to Euphemia. Euphemia told her that she better get the money because if she did not "Vinnie" would have his head. With other evidence presented at trial, it is reasonable to infer that the reference to "Vinnie" was to Vincent Papa, and that Euphemia wholesaled heroin supplied by Papa.

On February 3, 1972, Papa was arrested in the Bronx. At the time of arrest, he and his companion, Joseph DiNapoli, were in possession of a suitcase containing nearly $1,000,000. Shortly after the money was seized, Euphemia told Moreland "that his people had got hit hard for money."

In sum, the Papa organization, as developed at trial on the Southern District indictment, operated through three major wholesalers: Stanzione, Locorriere, and Euphemia. Joan Moreland and an entou-

rage of her assistants served to link the Papa heroin to the street. The two focal points from which the conspiracy operated were Ditmars Car Service, in Astoria, Queens, and the Astoria Colts Social Club located nearby. Drugs were picked up by the wholesalers or Ragusa in Queens and sold in Queens, the Bronx, and the upper West side of Manhattan. Papa was in command of the conspiracy from 1967 until 1972.

*The Eastern District Indictment*

The Eastern District indictment charged appellant and twenty-one co-defendants with violations of the federal narcotics laws. Of the counts relevant to appellant, Count One charged Papa and twenty-one named co-defendants and "others to the Grand Jury unknown" with conspiring to traffic in narcotics from April 1, 1967 through May 1, 1971 in violation of 21 U.S.C. §§ 173, 174 and with conspiring in violation of 21 U.S.C. § 846 to violate 21 U.S.C. §§ 812, 841(a)(1), 841(b)(1)(A), 951(a)(1) and 952, from May 1, 1971 through December 18, 1971. Count Five charged Papa, Anthony Passero, Anthony Loria, Virgil Alessi and Frank DiAmatto with the substantive offense of engaging in a continuing criminal enterprise from March 1, 1967 through December 18, 1971 in violation of 21 U.S.C. § 848. Because there was no trial on this indictment and no bill of particulars was requested or filed, the scope of the conspiracy charged must be gathered from the grand jury proceedings and the minutes of the Rule 11 hearing held when Papa's guilty plea was entered.

The Eastern District conspiracy, broadly outlined, was of the chain variety. Appellant headed the organization, working in partnership with co-defendant Anthony Passero for several years and later with co-defendant Virgil Alessi. Papa and whoever was his partner at the time, acted as the principle supplier of heroin for wholesalers, among whom Anthony Loria, Rocco Evangelista, and Danny Ranieri appear to have been the most active. These wholesalers, utilizing the services of stash men and couriers, supplied retailers such as Stanton Garland and Angelo Paradiso with drugs for ultimate street distribution.

The grand jury testimony of Paradiso and Garland describe the operation of this conspiracy. Paradiso delivered heroin to various distributors in the Bronx and Manhattan for Anthony Loria. Acting in this capacity from 1967 through January 1971, Paradiso met Loria's ·suppliers, Vincent Papa, Virgil Alessi, Anthony Passero and Frank DiAmato. Initially these four broke down into two partnerships, one between Alessi and DiAmato and the other between Papa and Passero. At some point, the exact time of which is unclear, DiAmato and Passero terminated their dealings with Loria, and Papa and Alessi paired up to supply Loria jointly.

Stanton Garland distributed heroin he purchased from Danny Ranieri and Rocco Evangelista. Through Ranieri, Garland met the source of the narcotics which flowed down to him—Papa and Alessi. During the summer of 1971, Garland, Papa, Ranieri, Evangelista, and Alessi had a meeting. At this meeting Papa announced that he planned to "get out" of the business. It was becoming apparent to Papa that the Loria-Evangelista-Ranieri group was under investigation. Indeed, "foot soldiers" of each, Paradiso and Garland, were both arrested by December 18, 1971. "Getting out" did not mean the cessation of all of Papa's narcotics activity. Rather, it meant merely the termination of his partnership with Alessi and the business conducted with the Loria-Evangelista-Ranieri group. Papa withdrew from the conspiracy by the end of 1971.

The Eastern District conspiracy, then, was one in which Papa, Alessi, Passero, and DiAmato served to supply a group of wholesalers—principally Ranieri, Evangelista and Loria—who in turn supplied large retailers such as Garland and Paradiso. A central meeting place for members of the conspiracy was a bar in Long Island City known as "Prudenti's." Narcotics transactions centered at Prudenti's, Loria's home in North Babylon, Long Island, and several

locations in the Bronx, none of which correspond with the locales in the Southern District indictment.

*The Double Jeopardy Claim; The Conspiracies Compared*

Papa argues that the Southern and Eastern District conspiracies were in reality one single conspiracy and thus his second prosecution—the Southern District case—was violative of the fifth amendment guarantee against double jeopardy. The district court, after conducting two evidentiary hearings, reviewing extensive briefs, and carefully scrutinizing the record of both cases, rejected appellant's former jeopardy plea. We agree with the district court.

Claims of double jeopardy arising from more than one conspiracy prosecution are not new to this court. The traditional refrain in response to such claims is that the appellant bears the burden of proving that the prosecutions are indeed for the same offense in law and in fact. Again, traditionally, whether offenses are the same under this standard is determined by applying the "same evidence test," that is, by examining whether the evidence required to support conviction in one of the prosecutions would have been sufficient to support conviction in the other prosecution. *United States v. McCall,* 489 F.2d 359, 362–63 (2d Cir. 1973), *cert. denied,* 419 U.S. 849, 95 S.Ct. 88, 42 L.Ed.2d 79 (1974); *United States v. Pacelli,* 470 F.2d 67, 72 (2d Cir. 1972), *cert. denied,* 410 U.S. 983, 93 S.Ct. 1501, 36 L.Ed.2d 178 (1973); *United States v. Edwards,* 366 F.2d 853, 872 (2d Cir. 1966), *cert. denied sub nom., Jakob v. United States,* 386 U.S. 908, 87 S.Ct. 852, 17 L.Ed.2d 782 (1967); *United States v. Kramer,* 289 F.2d 909, 913 (2d Cir. 1961). Appellant cannot meet this burden. The two indictments under which he was charged alleged different co-conspirators and different overt acts. The evidence adduced at trial on each of these indictments would, of necessity, be different and fail to meet the requirements of the same evidence test.

■ However, the efficacy of the same evidence test is peculiarly open to question in narcotics conspiracy cases. Because the government can tailor the overt acts charged in each indictment, prosecutorial discretion may account for a single conspiracy's being capable of proof in several prosecutions requiring different evidence for conviction. Thus, the same evidence test has been tempered by the consideration that a conspiracy may not be subdivided arbitrarily in such a way as to result in multiple indictments on a single conspiratorial agreement. *United States v. Bommarito,* 524 F.2d 140 (2d Cir. 1975); *United States v. Young,* 503 F.2d 1072, 1075 (3d Cir. 1974); *United States v. Mallah,* 503 F.2d 971, 985 (2d Cir. 1974), *cert. denied,* 420 U.S. 995, 95 S.Ct. 1425, 43 L.Ed.2d 671 (1975).

■ Narcotics conspiracy cases, moreover, present an additional complication in the analysis of a defendant's claim of multiple prosecution for a single conspiracy. A long line of cases holds one dealing in large amounts of narcotics to the knowledge that he is part of a larger conspiracy. *United States v. Sisca,* 503 F.2d 1337, 1345 (2d Cir.), *cert. denied,* 419 U.S. 1008, 95 S.Ct. 328, 42 L.Ed.2d 283 (1974); *United States v. Cirillo,* 499 F.2d 872, 887–88 (2d Cir.), *cert. denied,* 419 U.S. 1056, 95 S.Ct. 638, 42 L.Ed.2d 653 (1974); *United States v. Arroyo,* 494 F.2d 1316, 1319 (2d Cir. 1974); *United States v. Bruno,* 105 F.2d 921, 922 (2d Cir.), *rev'd on other grounds,* 308 U.S. 287, 60 S.Ct. 198, 84 L.Ed. 257 (1939). The basic reasoning of these cases is that a narcotics conspiracy moving large quantities of raw drugs from importer through myriad channels to the addict consumer is akin to a vertically integrated loose-knit business combination. *United States v. Bynum,* 485 F.2d 490, 495 (2d Cir. 1973), *vacated and remanded on other grounds,* 417 U.S. 903, 94 S.Ct. 2598, 41 L.Ed.2d 209 (1974). From the interdependence which exists between each level of the vertical chain, agreement among all parties facilitating the successful operation of the chain is presumed. *United States v. Agueci,* 310 F.2d 817, 826–27 (2d Cir. 1962), *cert. denied,* 372 U.S. 959, 83 S.Ct. 1013, 10 L.Ed.2d 11 (1963). This presumption, how-

ever, is not unbounded. We recently cautioned the government that

> "it may be unnecessarily exposing itself to reversal by continuing the indictment format reflected in this case [indictment naming twenty-eight defendants]. While it is obviously impractical and inefficient for the government to try conspiracy cases one defendant at a time, it has become all too common for the government to bring indictments against a dozen or more defendants and endeavor to force as many of them as possible to trial in the same proceeding on the claim of a single conspiracy when the criminal acts could be more reasonably regarded as two or more conspiracies, perhaps with a link at the top."

*United States v. Sperling,* 506 F.2d 1323, 1340–41 (2d Cir. 1974), *cert. denied,* 420 U.S. 962, 95 S.Ct. 1351, 43 L.Ed.2d 439 (1975). And, in *United States v. Bertolotti,* 529 F.2d 149, 151 (2d Cir. 1975) we reversed narcotics conspiracy convictions "[b]ecause of the Government's failure to heed our admonition" in *Sperling.*

These competing considerations have given rise to a modification of the burden of proof imposed upon a defendant when raising a plea of former jeopardy. In *United States v. Mallah, supra,* upon which appellant places principal reliance, we held that once a defendant introduces sufficient evidence that the two conspiracies alleged were in fact one, the burden shifts to the government to rebut the inference of unity.

The particular facts which compelled the *Mallah* court to reverse the conviction of appellant Pacelli warrant elaboration. Pacelli was first convicted of conspiring with three named co-defendants and "others to the Grand Jury unknown" to traffic in narcotics from January 1, 1971 to June 14, 1971. [Pacelli I] All overt acts alleged took place in New York City in May, 1971. The proof indicated that Pacelli's co-defendants were underlings in a narcotics conspiracy but did not define the scope of the operation of which they were a part. Pa-

celli's second conviction [Pacelli VI] [5] also involved membership in a narcotics conspiracy, this time with sixteen named co-defendants and "others to the Grand Jury unknown." This conspiracy allegedly began the same date as that in Pacelli I and continued into 1973. Again all overt acts occurred in New York City. The proof in Pacelli VI established a large-scale conspiracy with Pacelli near the core and a large staff beneath him. The court noted the fact that the period of the first conspiracy was totally subsumed by the period of the second. Also, the location of the conspiracies was the same. These factors alone, however, are not sufficient indicia of a single conspiracy. As the *Mallah* court recognized, "New York City is large enough to harbor two simultaneous narcotics conspiracies . . . ." 503 F.2d at 983.

The naming of only low level foot soldiers and Pacelli, together with "others to the Grand Jury unknown," in Pacelli I suggested that the others unknown were the named defendants in Pacelli VI. The Pacelli I conspiracy could not have operated without a larger organization backing it up. The suggestion that this larger organization was the Pacelli VI network was further buttressed by evidence that personnel in one conspiracy were acquainted with those in the other. Thus, the fear to which *Mallah* was a response was that the organization intervening between the top of the conspiracy and the foot soldiers, at best left vague in *Pacelli I,* was in fact the same organization fleshed out in detail in *Pacelli VI.* See *United States v. Bommarito, supra,* at 146.

■ Papa's reliance on *Mallah* is misplaced. While in the present case the Eastern and Southern District conspiracies were alleged to have commenced at the same time and to have operated in the same general location, the evidence that the conspiracies were distinct is overwhelming. As the District Court found below, each of these conspiracies was a "large-scale free standing operation." Each conspiracy had

---

5. We label these cases as did the opinion in *Mallah.* Pacelli's entanglements with the law unrelated to the double jeopardy issue account for the intervening numbers.

a full complement of personnel. Unlike the situation in *Mallah,* there is nothing here to suggest that one conspiracy was a part of the other, nothing to suggest that "others to the Grand Jury unknown" masked an overlap of personnel, and nothing to suggest that the success of one was in any way dependent upon or related to the other. While each conspiracy covered the same general area, the specific locations for meetings, making drug stashes, transfers, or collections are not the same. Moreover, the evidence that Papa withdrew from the Eastern District conspiracy while continuing his leadership of the Southern District conspiracy is further indication of the independence of the operations.

It seems likely that the three major wholesalers below Papa in the Southern District case, that is, Stanzione, Euphemia, and Locorriere, had more than the one major customer, Moreland, shown by the evidence. Accordingly, if the Eastern District indictment and the testimony supporting it had shown only Papa at the top and retailers on the level of Moreland at the bottom, the analogy to *Mallah* might be sustainable. That, however, was not the case; the intervening personnel in the Eastern District case were named, and they were not the three wholesalers developed in the Southern District trial. The defendant's claim of unity between the two organizations seems to us, at bottom, to rest on nothing but well-argued speculation.

Of the twenty-two named defendants in the Eastern District indictment and the six named defendants and thirty-two unindicted co-conspirators in the Southern District case, there are only two individuals whose names appear in both instances: Vincent Papa and Anthony Passero. Vincent Papa's central role as the main source of the narcotics distributed by each conspiracy is clear; Passero's role, however, presents some problems.

Passero was a named defendant in the Eastern District indictment and was listed as an unindicted co-conspirator in the bill of particulars filed on the Southern District indictment. His participation in partnership with Papa in the Eastern District conspiracy has been referred to above. His participation, if any, in the Southern District conspiracy is less apparent. During trial in the Southern District only one witness, Norman Young, mentioned Passero's name. Young, called as a witness by the Government, gave testimony about a money "laundering" service he performed for Papa whereby Papa was able to convert millions of dollars of small bills (street money) into large bills. Young also performed this service for Passero on at least two occasions. Papa argued before the jury that the money laundered by Young had nothing to do with the Southern District case. Thus, the only personnel link between the two conspiracies besides the appellant is tenuous at best.

■ Whereas in *Mallah* the court found that the Pacelli I defendants could not have successfully advanced a multiple conspiracy claim had they been charged together with the Pacelli VI defendants in a single conspiracy indictment, 503 F.2d at 983, such marshalling of the Eastern and Southern District defendants in a single indictment would epitomize the indictment format specifically condemned in *United States v. Sperling, supra. See also United States v. Bertolotti, supra; United States v. Miley,* 513 F.2d 1191, 1195, 1205–08 (2d Cir. 1975). Appellant was the director of two unrelated chains distributing narcotics; the mere fact that he supervised each chain does not transform two separate conspiracies into one. *Kotteakos v. United States,* 328 U.S. 750, 754–55, 66 S.Ct. 1239, 1242–43, 90 L.Ed. 1557, 1560–1561 (1946). *See United States v. Pacelli, supra; United States v. Aviles,* 274 F.2d 179 (2d Cir.), *cert. denied sub nom., Genovese v. United States,* 362 U.S. 974, 80 S.Ct. 1059, 4 L.Ed.2d 1010 (1960). *Compare, United States v. Bruno, supra.*

*Double Jeopardy and the Section 848 Count*

■ Appellant argues that dismissal pursuant to a plea bargain of Count 5 of the Eastern District indictment under which Papa was charged with engaging in a continuing criminal enterprise in violation of

21 U.S.C. § 848, necessarily absorbed the conspiracy and substantive offenses charged in the Southern District indictment and thus prior jeopardy on that count bars his prosecution. In essence, appellant contends that the offenses charged in the Southern District indictment constituted the necessary elements of the section 848 [6] continuing criminal enterprise count and concludes from this that principles of double jeopardy preclude the Southern District prosecution. To the extent appellant's section 848 claim is predicated upon equating the conspiracies charged in the Southern and Eastern indictments, our finding that the conspiracies were entirely independent violations of 21 U.S.C. § 846 is dispositive.

Appellant's argument apparently rests upon speculation as to the evidence which would have been introduced had there been a trial on the Eastern District indictment. He maintains that both the Ragusa testimony and the money seized upon his arrest in February, 1972, would have been used to prove the section 848 offense. Speculation as to the Ragusa testimony aside, the grand jury returned the Eastern District indictment solely on the basis of the testimony of Garland and Paradiso. Neither the grand jury nor even the government attorney in charge of the Papa case had any knowledge of the Ragusa testimony at the time the indictment issued or at the time the plea bargain was struck. The seized money which the appellant claims would have been used to prove the "substantial income" element of the section 848 offense was introduced in the trial below as evidence of the Southern District conspiracy. Evidence, such as the seized money, may be probative of more than one violation of the law; to introduce it into evidence during trial on

different offenses is entirely consistent with principles of double jeopardy.

■ This Court has recognized that prosecution under section 848 is distinct and separate from a prosecution for the conspiracy and substantive offenses that may constitute some of the evidence offered on a continuing criminal enterprise count. *United States v. Sperling, supra* (Sperling convicted of separate substantive, conspiracy, and section 848 offenses); *United States v. Sisca, supra* (appellant Abraham convicted of separate conspiracy and section 848 offenses); *United States v. Manfredi*, 488 F.2d 588 (2d Cir. 1973), *cert. denied*, 417 U.S. 936, 94 S.Ct. 2651, 41 L.Ed.2d 240 (1974) (appellant LaCosa convicted of separate substantive, conspiracy, and section 848 offenses). In sum, we reject appellant's claim that the dismissed section 848 count of the Eastern District indictment immunized him from the prosecution below.

*Due Process and the Eastern District Plea Bargain*

■ Appellant makes the additional argument that the prosecution below is in contravention of a plea bargain negotiated on the Eastern District indictment, and, citing *Santobello v. New York*, 404 U.S. 257, 92 S.Ct. 495, 30 L.Ed.2d 427 (1971), claims that his due process rights have been violated. Essentially, Papa contends that included within the scope of the plea bargain was an agreement that Papa would not be prosecuted on the basis of testimony given by Joseph Ragusa, who was a key government witness in the prosecution below. The District Court held a hearing to determine the scope of the Eastern District promise and concluded that the instant prosecution was not within its coverage. We agree.

---

**6.** 21 U.S.C. § 848 provides in relevant part:
(a)(1) Any person who engages in a continuing criminal enterprise shall be sentenced to a term of imprisonment [as specified].

.  .  .  .  .

(b) For purposes of subsection (a) of this section, a person is engaged in a continuing criminal enterprise if—
(1) he violates any provision of this subchapter or subchapter II of this chapter the punishment for which is a felony, and

(2) such violation is a part of a continuing series of violations of this subchapter or subchapter II of this chapter—
(A) which are undertaken by such person in concert with five or more other persons with respect to whom such person occupies a position of organizer, a supervisory position, or any other position of management, and
(B) from which such person obtains substantial income or resources.

Under the Eastern District indictment appellant, a prior narcotics law offender, was susceptible to a minimum term of ten to forty years of imprisonment without parole on the conspiracy count, and a minimum of ten years to life imprisonment on the continuing criminal enterprise count. Also pending at the time of plea negotiations was an Internal Revenue Service investigation of Papa for tax evasion for the years 1967 through 1970. After extensive discussion, Papa, through his counsel, agreed to plead guilty to the conspiracy count, and waive indictment and plead guilty to one count of a four count tax evasion information. This plea was to be in full satisfaction of the narcotics indictment and tax evasion information. The Eastern District Strike Force Attorney[7] in charge of the investigation and prosecution of Papa, James Druker, promised to recommend a five year sentence on the narcotics charge and a concurrent five year sentence on the tax evasion charge. The District Judge before whom Papa pleaded guilty accepted the plea and very lenient sentence recommendation after Druker disclosed weaknesses in the government's case.

Although no other promises are apparent from the minutes of the hearing held pursuant to Rule 11 of the Federal Rules of Criminal Procedure, the court below found that the bargain included certain conditions relating to Papa's co-defendants,[8] and found, furthermore, that due process would have precluded indictment in the Eastern District on the basis of Ragusa's testimony on July 18, 1972 before an Eastern District Grand Jury. The plea bargain was struck on August 18, 1972. Druker told Papa's attorneys on that day that the plea would satisfy any investigations then known to the Eastern District and stated that he knew of no other investigations or cases. Although Druker was then unaware of the Ragusa testimony, the court below found that Druker was apprised of the Ragusa investigation prior to formal entry of the plea on September 5, 1972, and therefore it fell within the purview of Druker's representations to Papa's counsel.

The critical issue before the District Court now before us on appeal is whether Druker's representations similarly encompass the prosecution initiated in the Southern District. We affirm the finding of the District Court that "[i]t is clear . . . that Mr. Druker's representations to Mr. Papa's attorneys did not include the independent investigation undertaken two years later in this [the Southern] District, culminating in the present indictment."

The question here does not, as appellant suggests, concern the breadth of the respect that principles of due process require one district of the United States Attorneys' Office to accord promises made by a Strike Force Attorney in another district. Compare United States v. Carter, 454 F.2d 426 (4th Cir. 1972) (en banc), cert. denied, 417 U.S. 933, 94 S.Ct. 2646, 41 L.Ed.2d 237 (1974), with United States v. Boulier, 359 F.Supp. 165 (E.D.N.Y.1972), aff'd sub nom. United States v. Nathan, 476 F.2d 456 (2d Cir.), cert. denied, 414 U.S. 823, 94 S.Ct. 171, 38 L.Ed.2d 56 (1973). The representations made by Druker related expressly and by necessary implication exclusively to Eastern District investigations and prosecutions. The terms of the bargain did not extend to matters under investigation elsewhere. Papa's attorneys' principal concern was to ensure that their client would not be re-in-

---

7. The Strike Force is part of the Organized Crime and Racketeering Section of the Criminal Division of the Department of Justice. The Strike Force assigned to a particular geographic area is responsible for supervising all federal investigations of organized crime within its assigned area and coordinating such investigations with state and local efforts against organized crime. The Chief of a Strike Force and the United States Attorney in that area are responsible for keeping each other fully informed of all organized criminal matters in progress. See, Guidelines Governing Interrelations Between Strike Forces and United States Attorneys' Offices, Office of the Attorney General, Order No. 431–70, April 20, 1970.

8. The court found that the bargain included the dismissal of charges against co-defendants Ranieri, Evangelista, and Alessi, upon their surrender. Co-defendant Passero was to plead guilty.

dicted on "pieces" of the Eastern District conspiracy. Druker promised that the bargain immunized Papa from any further prosecution on the basis of any future information he received related to the Eastern District conspiracy. Papa's attorneys secured a promise from Druker that there would be no additional prosecution stemming from matters presently under investigation in the Eastern District. Druker specifically refused to grant appellant *"carte blanche"* immunity as to all his past criminal conduct, and carefully noted that Papa was still subject to prosecution on any unrelated criminal activity. Never once was Druker asked to inquire about investigations in the Southern District nor was he asked to include Southern District crimes in the plea negotiations. Indeed, when Druker was queried by Papa's attorneys as to the money seized from Papa in February, 1972, he responded: "It's in the Southern District's bailiwick and I don't know what if anything they are going to do with it."

Although the Ragusa matter did not relate to a "piece" of the Eastern District conspiracy, it did concern a matter under investigation in the Eastern District at the time the plea was entered. As such, the Court below found the Ragusa matter could not, consistent with *Santobello, supra,* have formed the basis of a prosecution of Papa in the Eastern District, a point we need not reconsider. The Southern District prosecution, however, stemmed from investigations conducted which were entirely independent of this testimony, and which discovered the existence of Ragusa as a witness from entirely different sources. There is no causal link between the Ragusa testimony known to Druker and the Southern District investigation which commenced two years later. With no such link and promises limited to Druker's "bailiwick," it cannot be said that the prosecution below was in contravention of the Eastern District plea bargain.

*The Conspiracy Charge*

■ Appellant contends that reversible error was committed when the trial judge failed to instruct the jury adequately upon elements of the pre-May, 1971 "old law" conspiracy offense charged in Count One of the indictment. An essential element of conspiring to violate the "old law," 21 U.S.C. § 174, is illegal importation and knowledge thereof. When the judge instructed the jury as to the elements necessary to find a conspiracy to violate 21 U.S.C. § 174, he omitted to note specifically that knowledge of illegal importation is an element of the offense. We find, however, that the charge taken as a whole sufficiently apprised the jury of the elements which must be proved to find the defendant guilty.

Appellant relies on our decision in *United States v. Massiah,* 307 F.2d 62, 70 (2d Cir. 1962) which found reversible error in the judge's failure to instruct the jury that knowledge of illegal importation was a necessary element of the conspiracy. The trial judge in *Massiah* did not read the indictment to the jury and erroneously instructed them that the conspiracy charged was under the general conspiracy statute, 18 U.S.C. § 371, rather than the conspiracy clauses of 21 U.S.C. § 174. Considering the charge as a whole, this Court found "that the jury could not have had the slightest idea that they must find knowledge of importation in order to convict under the conspiracy count." 307 F.2d at 71.

The charge below did sufficiently alert the jury to this essential element. The instruction to the jury included a reading of 21 U.S.C. § 174 *and* the indictment which included the statutory language requiring proof of knowledge of illegal importation. Repeatedly the jury was referred to the statute and the indictment during the instructions which incorporated by reference all elements of the crime charged. While we regret that the charge was not more explicit, we find that the appellant was not prejudiced. *See United States v. Bentvena,* 319 F.2d 916, 938–40 (2d Cir. 1963) (although court failed in jury charge to instruct jury of "knowledge of illegal importation element," reading of statute and indictment made elements of crime charged clear to jury).

*Other Claims*

We have carefully considered the other claims of error raised by appellant and find them to be without merit.