**UNITED STATES of America,**

**v.**

**Vincent DiNAPOLI, et al., Defendants.**

**No. SS 86 Cr. 245 (MJL).**

United States District Court,
S.D. New York.

April 7, 1987.

Rudolph W. Giuliani, U.S. Atty., S.D. N.Y., New York City by Alan M. Cohen, Mark R. Hellerer, Asst. U.S. Attys., for U.S.

Gustave Newman, New York City, for defendant Vincent DiNapoli.

## MEMORANDUM OPINION AND ORDER

LOWE, District Judge.

Defendant Vincent DiNapoli ("DiNapoli") has moved for dismissal of the indictment currently pending against him in the Southern District of New York on the ground that it is barred by his April 16, 1982 plea agreement in the Eastern District of New York.

On March 4, 1987, this court issued a Memorandum Opinion and Order (the "March 4 Opinion") addressing defendant DiNapoli's motion.[1] After considering the terms of the 1982 plea agreement as recorded in the plea colloquy, the notes and affidavit of Michael Rosen ("Rosen"), one of DiNapoli's defense attorneys at that time, as well as the parties' submissions, this court found that the 1982 plea agreement in the Eastern District was not intended to cover a prosecution arising out of a strictly Southern District investigation which did not begin until the next year. In an exercise of caution, however, this court granted the defendant a hearing and ordered the government to produce Lothar Genge ("Genge"), the Eastern District Strike Force attorney who investigated and prosecuted DiNapoli through the negotiation and acceptance of his plea in 1982.[2]

On March 26, 1987, a hearing was held before this court. Genge testified.[3] Rosen was also given an opportunity to be heard. The government and defendant DiNapoli made letter submissions dated March 31 and April 1, 1987, respectively.

The government has now asked this court to deny DiNapoli's motion upon a written finding that it is frivolous. The government requests that this court retain jurisdiction over the defendant pending his possible appeal to enable jury selection and trial to proceed, as scheduled, on April 6, 1987.[4] We grant the government's request.

---

1. The portion of the March 4 Opinion dealing with DiNapoli's motion begins on page 30 and ends on page 36.

2. Genge prosecuted, before an Eastern District judge and jury, defendant DiNapoli and his co-defendants on the 1981 RICO charges that resulted from his investigation. The trial resulted in a mistrial due to the illness of one of the jurors. Prior to the second trial, the defendants agreed to plead guilty.

3. Genge came from Fort Lauderdale, Florida, where he is currently employed by the Organized Crime and Racketeering Section of the United States Department of Justice. (Transcript of Hearing held March 26, 1987, "March 26 Tr.," p. 3).

4. A special panel of approximately 300 jurors has been called to begin jury selection on April 6, 1987. We further note that because only 20 percent of those called for jury duty in the Southern District actually appear, it was necessary for the Jury Clerk to summons approximately 1500 people to obtain those 300.

## DISCUSSION

We first address the merits of defendant DiNapoli's motion to dismiss the indictment. We will then address the issue of this court's continuing jurisdiction over the defendant pending any appeal of this decision.

### A. *The Merits* [5]

The relevant terms of defendant DiNapoli's 1982 plea agreement in the Eastern District are contained in the transcript of the plea colloquy:

MR. COHN:[6] ... Just a couple of other things. This plea to be made, if your Honor accepts it here today, will cover all pending investigations regarding Mr. DiNapoli as of, through and including today's date, within the control of the Federal Government—within the control of the Strike Force and the United States Attorney's Office, Southern and Eastern Districts.

MR. GENGE: Mr. Cohn is not correct. Our agreement is the plea, if the Court accepts it, would cover any pending investigation in the Eastern District Strike Force's Office and the U.S. Attorney's Office in the Eastern District.

THE COURT: You don't include the Southern District?

MR. GENGE: Particularly and I think there is the club investigation. I won't go into anything beyond its being handled in the Eastern District now.

MR. COHN: There is probably—

MR. GENGE: I just don't have any control over and I don't know what if any investigation they have pending in the Southern District. We have very little input. We can only do so much.

MR. COHN: We're perfectly happy with Mr. Genge's representation that to the best of his knowledge this club investigation which he feels is under the control of the Eastern District is covered and he knows if [sic] nothing else, and

we can't expect him to know if there is something in Louisiana or something along those lines, and we have no agreement, from Mr. DiNapoli.

In fact, the agreement is he will not be required to testify at trial or in the Grand Jury concerning any pending investigations relating to this club situation, relating to the Carpenter's Union or this club situation, or indictments relating to them, to which Mr. Genge referred.

(Transcript dated April 16, 1982 before Judge George C. Pratt, "Plea Tr.," pp. 7–9). Following the above exchange, the parties discussed other terms of the plea agreement. They returned to the question of the scope of DiNapoli's plea once more as follows:

THE COURT: All right. Then just to summarize the plea agreement as I have it here ...

The plea is to cover all pending investigations against Mr. DiNapoli in the Eastern District, particularly, including but not limited to one called the club investigation.

MR. ROSEN: May I interrupt you for a moment please?

THE COURT: Yes.

MR. ROSEN: Particularly then it might be in the Southern District, that—

THE COURT: On the club investigation?

MR. ROSEN: Yes, sir.

But, the U.S. Attorney's Office in the Eastern District subsumed or assumed jurisdiction over it, so it really does cover the Southern District to that extent.

THE COURT: You understand what Mr. Rosen is saying, Mr. Genge?

MR. GENGE: I think I do.

THE COURT: And that is part of the agreement?

MR. GENGE: Yes.

THE COURT: And Mr. Genge represents that he doesn't know of any oth-

---

5. The March 4 Opinion is incorporated in this decision by reference. For the sake of clarity, however, we begin again with our interpretation of the plea agreement.

6. DiNapoli was represented by Roy Cohn and Rosen.

er active investigations against Mr. Di-Napoli elsewhere, but those that may be going on in his ignorance he can do nothing about and you'll have to take the risk.

(Plea Tr., pp. 12–14).

As this court has already determined Di-Napoli's April 16, 1982 plea covered the Southern District only to the extent that there was then pending a "club investigation" in the Southern District over which the Eastern District had assumed jurisdiction. (March 4 Opinion, pp. 34–35).

The thrust of defendant DiNapoli's argument is that (1) the "club" investigation encompassed bid-rigging in the entire construction industry, including concrete; and (2) that the current Southern District indictment grew out of that investigation.[7] Both claims are wholly without merit.

### 1. *The Scope of the Investigation*

■ In support of his claim that the "club" investigation extended to bid-rigging within the entire construction industry, the defendant relies upon (1) Rosen's notes; (2) Genge's testimony at the March 26 hearing; and (3) portions of transcripts from the Eastern District mistrial.

Rosen's notes made at the time of the plea agreement state:

This plea covers all matters to date, including all pending investigations against Mr. DiNapoli regarding his involvement with the carpenter's union and the alleged construction bid-rigging (the

"Club") in the Eastern and Southern Districts of New York.

(Affidavit of Michael Rosen, "Rosen Aff.," ¶ 6). In the margin, Rosen wrote: "Any and all building construction field?" Despite his use of the phrase "construction bid-rigging": to define the "Club", Rosen still apparently had his own questions about whether trades other than carpentry were covered by the plea. It is certainly clear from Rosen's notes, however, that only investigations that were pending at the time of the plea were encompassed by the agreement.

Whatever Rosen's inconclusive understanding of the scope of the "club" investigation, we are here concerned with the understanding of both parties to the plea agreement. *See United States v. Carbone*, 739 F.2d 45, 46 (2d Cir.1984). The defendant relies heavily upon Genge's statement at the March 26 hearing that the government initially sought to investigate corruption in entire construction industry. (March 26, Tr., p. 10). The reliance is misplaced.

■ It is clear from Genge's testimony, that the government's initial investigation into "construction" corruption occurred in the Eastern District alone[8] and that, in any case, at the time of the defendant's plea, it had become a carpentry investigation. (March 26 Tr., p. 10). It is also clear that while the Southern District had some involvement with the "club" investigation, at the time of DiNapoli's plea, the "club" in-

**7.** DiNapoli is *not* claiming that the criminal activity for which he was indicted and pled guilty in the Eastern District is the same conduct for which he now faces trial in the Southern District. He is claiming that the investigations which underlie the indictments are the same or causally related and that therefore both indictments are covered by the 1982 plea. He asks for protection beyond the limits of the double jeopardy clause of the Fifth Amendment of the United States Constitution. We presume that his claim is based upon the due process clause.

**8.** At the hearing, Genge described two aspects of the investigation that culminated in the Eastern District indictment of defendant DiNapoli: (1) an undercover operation conducted by FBI Agent James Abott and others in the Eastern

District investigating corruption in the carpentry industry relating to payoffs for small non-union jobs, (March 26 Tr., pp. 4–5, 8); and (2) an Eastern District investigation, conducted in part by FBI agents from the Southern District, into the drywall club that was trying to fix prices in the drywall industry. (March 26 Tr., pp. 6–8).

Genge did state that the government initially sought to investigate corruption in the entire construction industry. He was, however, responding to defense counsel's question which related to Agent Abott's investigation. (March 26 Tr., p. 9). Genge had already explained that the Southern District was not involved in Agent Abott's undercover operation. (March 26 Tr., p. 8).

vestigation referred strictly to an investigation of a dry-wall contractors price fixing group. (March 26 Tr., pp. 6, 15). As of the date DiNapoli entered his plea of guilty, Genge was not exercising jurisdiction over an investigation covering the construction industry as a whole, or the concrete industry in the Southern District in particular. (March 26 Tr., p. 25).

In addition to his misplaced reliance upon Rosen's notes and Genge's testimony, the defendant attempts to support his claim with nine transcripts of conversations (which occurred during 1978 and 1979) from the Eastern District mistrial.[9] We need not address the transcripts individually or in significant detail. Some of the transcribed conversations reflected discussions about work by trades other than carpentry, including concrete. Other transcripts revealed conversations about individuals who have some connection with either the teamsters union or the concrete mason laborers.

The transcripts are as irrelevant as Genge's statement that the investigation initially covered the construction business as a whole. Each of the nine transcripts resulted from recordings by undercover FBI Agent Abott. Abott's investigation was strictly an Eastern District, and not a Southern District operation (March 26 Tr., p. 8). Furthermore, Genge testified that it was his belief that during his tenure at the Eastern District Strike Force, none of the information gained from the Abott undercover investigation was turned over to the Southern District. (March 26 Tr., p. 35).

### 2. Connection to the Pending Southern District Indictment

DiNapoli argues that the instant indictment derives from a presumed Southern District "construction bid-rigging" investigation which was allegedly pending at the time of his Eastern District plea. Even if

such an investigation had been pending in the Southern District, DiNapoli has not established a link between any prior investigation and the one which led to his indictment in this case.

The evidence upon which DiNapoli relies is at best scanty. He states that: (1) one of the defendants in the Eastern District indictment is listed as an unindicted co-conspirator in the pending Southern District indictment; (2) there is a relationship between the subject matter of the two indictments, i.e. carpentry and concrete construction; and (3) "the current indictment alleges acts which occurred in 1981 and 1982 (Counts 8, 14, 16 and 20) prior to the defendants' 1982 plea." (Letter from Gustave Newman to the Court dated April 1, 1987, p. 2).

Even a cursory inspection of the indictments filed in the Eastern and Southern Districts reveals that the criminal conduct alleged is completely distinct. In the indictment before the court, DiNapoli is charged, as a "Capo"[10] of the Genovese Family of "La Cosa Nostra" which allegedly gained control of the concrete industry and conducted its affairs after 1980. The Genovese Family allegedly ran a "club" of concrete superstructure contractors engaged in bid-rigging and labor payoffs involving the Teamsters and the District Council of Cement and Concrete Workers, Laborers International Union of North America (the "Concrete Workers"). The Eastern District indictment charges bid-rigging and labor bribery by a group of dry-wall contractors and corrupt officials of the Brotherhood of Carpenters and Joiners (the "Carpenters Union"). As the government has pointed out, "the means alleged in the two indictments are different, the named defendants (with the exception of DiNapoli) are different, the corrupt unions involved are different, the member companies of the 'club' are different and the industry affected is different." (Government's Brief in

9. On April 2, 1987, we requested that the transcripts offered at the March 26 hearing be submitted to the court. We have reviewed those transcripts in their entirety.

10. A "Capo" is alleged to have a supervisory role in an organized crime family.

Opposition to Defendants' Pretrial Motions, "Gov't. Br.," pp. 90–91).

 The comparisons made by the defendant are *de minimis*. More importantly, they don't relate to the claim that the Southern District indictment grew out of a "club" investigation pending at the time of DiNapoli's plea. The fact that a defendant in the Eastern District case is an unindicted co-conspirator in the Southern District does not establish the identity of the conspiracies, let alone the identity of the investigations leading to those indictments. *See United States v. Papa*, 533 F.2d 815, 817 (2d Cir.), *cert. denied*, 426 U.S. 961, 97 S.Ct. 387, 50 L.Ed.2d 329 (1976); *United States v. Inmon*, 594 F.2d 352, 354 (3d Cir.), *cert. denied*, 444 U.S. 859, 100 S.Ct. 121, 62 L.Ed.2d 79 (1976). That carpentry and concrete are both part of the construction business does not mean that they are not amenable to separate investigation. The defendant states that Counts 8, 14, 16 and 20 of the Southern District Indictment allege acts which occurred prior to DiNapoli's 1982 plea agreement. With the exception of one mailing on March 3, 1982 in Count 20, we find no acts alleged which occurred before April 16, 1982 in those counts.[11]

A comparison of the indictments is far less illuminating than an inquiry into the investigations that form the basis for those indictments. The investigation which resulted in the Eastern District indictment "substantially predated" the investigation of the offenses charged in the Southern District, and was based upon electronic surveillance of DiNapoli and one of his co-defendants conducted prior to 1981. (Gov't. Br., p. 89). The Southern District investigation "began independently in 1983"— nearly three years after the first Eastern District DiNapoli indictment—"with electronic surveillance at the Palma Boy Social Club and the Social Club located at 2244 First Avenue." (Gov't. Br., p. 90). The government represents that it first learned of DiNapoli's involvement with the concrete club from the Palma Boy and 2244 First Avenue Social Club surveillance. Any *de minimis* overlap between the two prosecutions is inconsequential in view of the independence of the Eastern and Southern District investigations. *See Papa*, 553 F.2d at 825 (2d Cir.1976); *United States v. Alessi*, 544 F.2d 1139, 1153 (2d Cir.), *cert. denied*, 429 U.S. 960, 97 S.Ct. 384, 50 L.Ed.2d 327 (1976).

Based upon the facts in this case, we conclude that the defendant's motion to dismiss the indictment as barred by his 1982 Eastern District plea agreement is wholly without merit.

## B. *Jurisdiction*

Because we find defendant DiNapoli's position to be wholly without merit and anticipate his appeal from this decision,[12] we address the question of this court's continued jurisdiction over him.

Regardless of an appeal by the defendant, we believe that this court may contin-

---

11. Our independent review of the indictment revealed that Racketeering Acts 7, 13, 15 and 18, which correspond to substantive counts 9, 15, 17 and 20, do contain allegations of mailings prior to April 16, 1982. We fail, however, to see the significance of this fact or the defendant's argument. That such evidence may have been available prior to the defendant's plea does not establish (1) that it was actually obtained prior to the plea; or (2) that the evidence was not subsequently and independently obtained by the Southern District.

We note that with one exception, the indictment returned against DiNapoli relates to jobs that went to contract in 1980 and beyond, after the 1978–79 transcribed conversations relied upon by the defendant. (March 26, Tr., p. 40).

12. We make no determination as to the appealability of this decision. The Second Circuit has ruled that "an order denying a *colorable* claim to dismiss an indictment for violation of a prior plea agreement remains appealable in this Circuit." *United States v. Abbamonte*, 759 F.2d 1065, 1071 (2d Cir.1985) (emphasis added, citations omitted); *see also United States v. Alessi*, 536 F.2d 978 (2d Cir.1976) (Alessi I); *United States v. Alessi*, 544 F.2d 1139, 1143–52 (2d Cir.) (Alessi III), *cert. denied*, 429 U.S. 960, 97 S.Ct. 384, 50 L.Ed.2d 327 (1976). We leave it to the circuit to decide whether a frivolous claim can still be "colorable".

ue to exercise jurisdiction over DiNapoli. Our adoption of the dual jurisdiction rule is predicated upon (1) our written finding of the complete lack of factual merit in the defendant's claim, and (2) the litigation context in which DiNapoli's potential appeal occurs.

We have found no Second Circuit case which addresses the question of whether a district court may retain jurisdiction over a criminal defendant after denial of his motion to dismiss an indictment as barred by a prior plea agreement. The nine other circuit courts, however, which have considered the issue in the double jeopardy or speedy trial context have all ruled in favor of dual jurisdiction. *United States v. Black,* 759 F.2d 71, 73 (D.C.Cir.1985); *United States v. Ferris,* 751 F.2d 436, 440 (1st Cir.1984); *United States v. Cannon,* 715 F.2d 1228, 1231 (7th Cir.1983), *cert. denied,* 464 U.S. 1045, 104 S.Ct. 716, 79 L.Ed.2d 178 (1984); *United States v. Hines,* 689 F.2d 934, 936–37 (10th Cir.1982); *United States v. Bizzard,* 674 F.2d 1382, 1385 (11th Cir.), *cert. denied,* 459 U.S. 973, 103 S.Ct. 305, 74 L.Ed.2d 286 (1982); *United States v. Grabinski,* 674 F.2d 677, 679–80 (8th Cir.) (en banc), *cert. denied,* 459 U.S. 829, 103 S.Ct. 67, 74 L.Ed.2d 67 (1982); *United States v. Lanci,* 669 F.2d 391, 394 (6th Cir.), *cert. denied,* 457 U.S. 1134, 102 S.Ct. 2960, 73 L.Ed.2d 1350 (1982); *United States v. Leppo,* 634 F.2d 101, 105 (3d Cir.1980); *United States v. Dunbar,* 611 F.2d 985, 987–88 (5th Cir.) (en banc), *cert. denied,* 447 U.S. 926, 100 S.Ct. 3022, 65 L.Ed.2d 1120 (1980).

In addition, at least one district court within the Second Circuit has recognized the dangers presented by the expansion of interlocutory appeals in criminal cases. That court noted, with apparent favor, that other circuits have ruled that a "district court is not divested of jurisdiction to proceed by the filing of an appeal from the denial of a frivolous Double Jeopardy motion." *United States v. Ippolito,* 509

F.Supp. 1205, 1210 n. 6 (E.D.N.Y.1981) (citations omitted).

The rationale for the dual jurisdiction rule was best stated by the Fifth Circuit in *United States v. Dunbar,* 611 F.2d 985 (5th Cir.) (en banc), *cert. denied,* 447 U.S. 926, 100 S.Ct. 3022, 65 L.Ed.2d 1120 (1980). The *Dunbar* court identified the need for a "reasoned choice" regarding whether the judge-made rule of automatic divestment of district court jurisdiction upon the filing of a notice of appeal should prevail in the context of an interlocutory criminal appeal. The court reasoned:

> On one hand, the Court must recognize that the failure to review a colorable double jeopardy claim before trial begins creates a substantial risk that the accused's constitutional rights will be infringed. On the other hand, we must weigh the concern … that the divestiture of jurisdiction rule "leaves the court powerless to prevent intentional dilatory tactics, forecloses without remedy the non-appealing party's right to continuing trial court jurisdiction, and inhibits the smooth and efficient functioning of the judicial process."

*Dunbar,* 611 F.2d at 988 *quoting United States v. Hitchmon,* 602 F.2d 689, 694 (5th Cir.1979) (en banc). The *Dunbar* court, and those persuaded by its analysis, have adopted a rule that reflects common sense while protecting the defendant's right to interlocutory appeal.

The courts have uniformly predicated dual jurisdiction upon the district court's finding that the defendant's claim is frivolous or wholly lacking in merit. As the Third and Fifth Circuits have recognized, district courts are not strangers, to making a determination of whether a claim or appeal is frivolous.[13] *Dunbar,* 611 F.2d at 988; *Leppo,* 634 F.2d at 105 n. 3.

■ Moreover, the defendant's right to a decision on appeal prior to commencing trial is protected by the Appellate court's

---

13. *See e.g.,* 18 U.S.C. § 3148 (denial of bail if appeal is frivolous); *Coppedge v. United States,* 369 U.S. 438, 443–45, 82 S.Ct. 917, 919–21, 8 L.Ed.2d 21 (1962) (denial of leave to appeal *in* *forma pauperis* if appeal is frivolous); 28 U.S.C. § 1915(d) (dismissal of *in forma pauperis* cases if frivolous).

power to either stay the proceedings below under F.R.A.P. 8, or to issue a writ of mandamus under 28 U.S.C. § 1651. *Dunbar*, 611 F.2d at 989.

 While the dual jurisdiction rule has developed in the context of double jeopardy claims, we see no reason to distinguish plea agreement claims.[14]

The dual jurisdiction rule is particularly compelling in the context of the present litigation. If divested of jurisdiction, this court would be forced to choose between severing defendant DiNapoli out of the case or adjourning the entire trial. Although severance might initially appear to be an attractive option, such a decision would permit DiNapoli to circumvent the court's prior denial of his severance motion. (*See* March 4 Opinion, pp. 13–14). While adjournment of any criminal trial is burdensome, adjournment of a trial which involves 13 other defendants[15] accused in a 40–count, 115–page RICO indictment, which has taken more than a year to prepare for trial due to thousands of hours of electronic surveillance, is disruptive and would not promote the efficient functioning of the judicial process. Moreover, any delay might implicate the speedy trial rights of DiNapoli's co-defendants.

We believe that it is reasonable and proper for this court to retain jurisdiction over defendant DiNapoli pending his possible appeal from this decision.

To summarize, we deny the defendant's motion to dismiss the pending indictment as barred by his 1982 Eastern District plea agreement. We find, in addition, that on the facts of this case, the defendants' claim is wholly without merit. In view of that finding and the circumstances surrounding this litigation, we retain jurisdiction and

will commence jury selection, as scheduled, on April 6, 1987.

It Is So ordered.

---

**14.** We note that the appealability of denials of plea agreement claims itself derives from the Supreme Court's decision in *Abney v. United States*, 431 U.S. 651, 97 S.Ct. 2034, 52 L.Ed.2d 651 (1977), which held that the denial of a double jeopardy motion is an appealable order under 28 U.S.C. § 1291.

**15.** Sixteen defendants were originally indicted. As a result of defendant Vincent Cafaro's agreement to cooperate with the government, he and his son, defendant Thomas Cafaro have been severed from the case. In addition, defendant Alphonse Mosca has been severed due to his illness.