UNITED STATES of America, Plaintiff,

v.

Joseph A. MACCHIA, a/k/a "Joseph Macchia, Sr.," Marat Balagula, Lawrence Macchia, George Macchia, Viktor Batuner, Michael Varzar, John Barberio and Joseph L. Macchia, a/k/a "Joseph Macchia, Jr." and "Joey", Defendants.

No. CR 92–1147 (S–1).

United States District Court,
E.D. New York.

March 9, 1994.

Stephen Huggard, U.S. Dept. of Justice, Northern Cr. Enforcement Section, Washington, DC, for plaintiff.

Howard D. Stave, Forest Hills, NY, for defendant Joseph A. Macchia.

Ephraim Savitt, New York City, for defendant Balagula.

Lefcourt & Dratel, P.C. by Gerald B. Lefcourt, New York City, for defendant Lawrence Macchia.

Newman & Schwartz by Robert Hill Schwartz, New York City, for defendant George Macchia.

Paul B. Bergman, New York City, for defendant Varzar.

Dilworth, Paxson, Kalish & Kaufman by J. Shane Creamer, Philadelphia, PA, for defendant Barberio.

Deinst, Serrins, Newman, O'Malley & Epstein by Kenneth I. Wirfel, New York City, for defendant Joseph L. Macchia, Jr.

*MEMORANDUM AND ORDER*

WEXLER, District Judge.

Defendants Marat Balagula ("Balagula") and John Barberio ("Barberio") move to dis-

miss Count One of the Superseding Indictment in the above-captioned criminal case, charging defendants with conspiracy to evade the federal gasoline excise tax in violation of 18 U.S.C. §. 371, on the ground of double jeopardy. Balagula and Barberio claim that their prosecutions on the conspiracy count is barred by their convictions on an earlier indictment brought in this Court. At oral argument on January 25, 1994, this Court ruled that Count One is not barred by double jeopardy. This opinion follows.

## I. BACKGROUND

### A. The Tarricone Indictment

The earlier prosecution of Balagula and Barberio stemmed from an indictment in this Court returned in January 1992, charging Balagula, Barberio and three co-defendants, Arthur Tarricone ("Tarricone"), Dominic A. Bombace and John Pabone ("Pabone") (the "Tarricone defendants"), with one count of conspiracy to evade the federal gasoline excise tax in violation of 18 U.S.C. §§ 371 and 3623, and two counts of attempted excise tax evasion in violation of 26 U.S.C. § 7201 and 18 U.S.C. §§ 2 and 3623. See United States v. Balagula, et al., CR 92–120 (the "Tarricone Indictment").

The Tarricone Indictment charged the Tarricone defendants with participating in the evasion of over $400,000 in federal gasoline excise taxes during the last quarter of 1985 and the first quarter of 1986. During that time, federal law imposed an excise tax of nine cents per gallon for each gallon of gasoline sold, unless the sale was between "registered wholesale companies," that is, companies holding a Registration for Tax–Free Transactions, a "Form 637" from the Internal Revenue Service ("IRS"). These Form 637 holders were known as "licensed" companies. Non–Form 637 holders, or unregistered companies, were known as "unlicensed" companies. Sales between licensed wholesalers, Form 637 holders, were tax-exempt. Such sales were considered "tax-free" because the seller was not required to pay the federal gasoline excise tax to the IRS. The excise tax generally was included in the sale price, and was commonly called a "tax included" or "tax paid" transaction.

The responsibility for paying the excise tax fell upon the last registered company in the distribution chain that sold to an unregistered company. Generally, a registered wholesaler included the amount of the excise tax in the cost of the gasoline sold to an unregistered company. The registered wholesaler was required to report the federal excise tax owed as a result of the sale in a quarterly return, a so-called IRS Form 720, and to remit the excise taxes at that time.

The Tarricone defendants allegedly used false invoices to disguise taxable gasoline sales of a company called A. Tarricone, Inc. ("ATI"), a company owned by defendant Tarricone, as tax-exempt transactions between From 637 holders, thereby concealing the federal excise tax liability of ATI. In broad outline, the evidence produced at trial showed that the Tarricone defendants employed a so-called "daisy chain" scheme to avoid the payment of the federal gasoline excise tax. In a "daisy chain" scheme, gasoline taxes are evaded by the creation of a "burn company," generally owned under an alias, which issues invoices reflecting that the applicable excise tax had been paid. By the time government discovers the nonpayment of tax, the "burn company" will have been dissolved and unavailable to pay the tax.

The daisy chain scheme employed by the Tarricone defendants basically worked as follows: ATI, a Form 637 holder, purchased barge loads of gasoline tax-free from other Form 637 holders and then created invoices for fictitious sales to a "burn company" called Conlo, Inc. ("Conlo"), which also held a valid Form 637, but which operated only to allow ATI to document the fictitious transactions. Conlo was controlled by defendant Pabone and an unindicted coconspirator named John Quock ("Quock"). There were no actual sales to Conlo. Rather, ATI sold the gasoline to non-Form 637 holders, including companies in which Barberio and Balagula were involved. Thus, ATI should have paid the federal excise tax on these sales. However, it did not. The conspirators contemplated that Conlo would subsequently be dissolved and would be unavailable to pay the tax.

To complete the daisy chain, the Tarricone defendants used another "burn company" controlled by Pabone and Quock, called Beck Equities, Inc. ("Beck"), a non-Form 637 holder, to issue invoices for fictitious sales to the non-Form 637 holders which were actually buying the gasoline directly from ATI. The false invoices made it appear that all taxes had been paid by Beck to Conlo, which in turn was supposed to have paid the federal excise tax. Among the companies invoiced by Beck were Westchester Hudson Petroleum Corp. ("WHPC") and Hamilton Oil Brokers, Inc. ("HOB"), which was owned by an unindicted coconspirator named John Byrne, but which Byrne testified was actually controlled by Balagula. In turn, HOB sold the "bootlegged" gasoline to a number of unregistered gasoline wholesalers, including Energy Makers of America, Inc. ("EMA"), a company owned by Balagula and for which Balagula worked, and Shore Line Oil Co., Inc., a/k/a Shoreco. Barberio was employed by Shoreco and WHPC. HOB issued invoices to EMA and other purchasers falsely reflecting that all excise taxes had been paid and were being passed on as part of the purchase price.

At the completion of the daisy chain, it appeared on paper that ATI sold the gasoline tax-free to Conlo as a sale between registered wholesalers; Conlo, in turn, sold the gasoline to Beck, an unregistered wholesaler, thereby triggering Conlo's obligation to pay the federal gasoline excise tax; and Beck, in turn, sold to other unregistered companies. Although Conlo, as a Form 637 holder selling to non-Form 637 holder Beck, should have paid the federal excise tax, no taxes were ever paid.

Balagula was convicted on all three counts for purchasing gasoline tax-free from ATI for HOB and of enlisting ATI as the gasoline supplier for the tax evasion scheme. Barberio was convicted on the first and third counts for knowingly participating in the scheme by purchasing gasoline tax-free from ATI on behalf of Shoreco. Balagula and Barberio appealed their convictions to the Second Circuit. Balagula's conviction was affirmed, but Barberio's case was remanded for an evidentiary hearing to determine the issue of whether Barberio's trial counsel rendered effective assistance. *See United States v. Tarricone,* 996 F.2d 1414 (2d Cir.1993). At the conclusion of an evidentiary hearing in August 1993 on the issue of effective assistance of counsel as to Barberio, this Court denied the claim. Barberio again appealed, and although the Second Circuit upheld this Court's decision denying Barberio's claim of effective assistance of counsel, it again remanded the case, this time based on certain prosecutorial misconduct, for a determination of whether there was any reasonable likelihood that a government witness' false testimony could have affected the judgment of the jury. *See United States v. Tarricone,* 11 F.3d 24 (2d Cir.1993). Determination of that issue is pending before this Court.

## B. *The Macchia Indictment*

In June 1993, in Count One of the Superseding Indictment, the grand jury charged Balagula, Barberio and six co-defendants, Joseph A. Macchia, his three sons Lawrence Macchia, George Macchia and Joseph L. Macchia, Viktor Batuner and Michael Varzar (the "Macchia defendants") with conspiracy to evade the federal gasoline excise tax in violation of 18 U.S.C. §§ 371 and 3623. *See United States v. Macchia, et al.,* CR 92–1147 (S–1) (the "Macchia Indictment"). In six additional counts, the Macchia Indictment also charges various of the defendants with attempted excise tax evasion in violation of 26 U.S.C. § 7201 and 18 U.S.C. §§ 2 and 3623. Balagula is charged in four of these counts. Barberio is charged only in Count One. It is Count One of the Macchia Indictment which Balagula and Barberio challenge on the ground of double jeopardy.

Count One of the Macchia Indictment charges the Macchia defendants with participating in the evasion of over $85 million in federal gasoline excise taxes, on nearly one billion gallons of gasoline, stemming from a "daisy chain" scheme occurring from approximately the end of 1982 or beginning of 1983 through and including the middle of 1988. During that time, the federal gasoline excise tax was nine cents per gallon until January 1, 1987, and was increased to 9.1 cents per gallon effective January 1, 1987. In addition,

beginning January 1, 1988, a registered company was required to pay to the United States a federal excise tax for each gallon of gasoline it sold to an unregistered company or removed from a gasoline terminal.

The Macchia Indictment alleges that a company called New York Fuel Terminal Corporation ("NYFT"), controlled by Joseph A. Macchia and his three sons (the "Macchias"), sold large quantities of gasoline to unlicensed companies without paying to the United States the federal excise tax due and owing on those sales. NYFT sold the gasoline to the unlicensed companies in a variety of ways. Most of the bootlegged gasoline sold by NYFT to the unlicensed companies was sold by "book transfer" [1] at the M & Q terminal in Brooklyn, a gasoline storage facility operated by NYFT. The remainder, it is alleged, was sold by barge in New York and New Jersey and by book transfer in New Jersey. A variety of falsified documents and records were used to cause the IRS to believe that "burn companies," and not NYFT, owed the excise taxes on the gasoline sold by NYFT to the unlicensed companies.

False invoices were created to show that NYFT sold hundreds of millions of gallons of gasoline to approximately 18 licensed companies, including ATI, Award Energy Corp., Baisley Park Neighborhood Centers, Belfa Enterprises, Inc., California Petroleum, Carger Corporation, Clix Fuel, Inc., Conlo, Flexx Petroleum Corp., Houston Holdings, J & E Enterprises, Inc., Janice Ventures Enterprises, Inc., Lewis Petrochemical & Trading Corp., Lou Halperin Stations, Inc., Northwest Petroleum, Inc., Rappaport Fuel, Inc., Riverside Oil Co., and TunYung Oil Corp. False invoices were then often created to indicate that the approximately 18 companies had sold the gasoline to a third company, when, in fact, the 18 companies did not purchase any gasoline from NYFT and did not sell any gasoline to third companies. The unlicensed companies which actually purchased the gasoline from NYFT often received a false invoice indicating that all taxes had been paid, when, in fact, the defendants knew no tax had been paid. The unlicensed purchasers were controlled by Balagula, Batuner and Varzar and included Mallard Distributing Corp., Malon Enterprises, Ltd., EMA, Lesez Petroleum Corp., J & J Petroleum Co., Inc., Pioneer Petroleum, Inc., and Galis Enterprises Ltd. The false invoices were reflected in the sales journals and ledgers of NYFT.

False cash receipts were used to disguise that NYFT received a large quantity of cash from the actual unlicensed purchasers of the gasoline, and from companies which had in turn purchased from the unlicensed purchasers. Much of that cash was reported in NYFT's books as having been received from the licensed companies, which purportedly had purchased the gasoline from NYFT. In reality, few if any of these cash payments were from the licensed companies.

False book transfers made it appear that gasoline sold by NYFT was transferred through the accounts of several other licensed and unlicensed companies before being received by the actual purchasers, when, in fact, the only transfers that occurred were from NYFT to the actual unlicensed purchasers. Listed as part of the overt acts are 55 book transfers of gasoline from NYFT to various companies during the period from November 1983 through December 1987. Among the companies identified in the 55 book transfers are Conlo, ATI, EMA and HOB, companies involved in the Tarricone case.

Thus, the daisy chain scheme made it appear, on paper, that the gasoline was sold tax-free by NYFT to other licensed companies, and that the licensed companies had in turn sold to unlicensed companies, which were the actual purchasers or which in turn sold to the actual unlicensed purchasers, when, in fact, the only sales that occurred were from NYFT to that actual unlicensed purchasers.

The Macchias shared many responsibilities and performed various functions in the companies they owned or controlled, including NYFT. Barberio allegedly worked for

---

1. A "book transfer" refers to the passing of title from one company to another of gasoline held within a terminal.

NYFT as the manager of wholesale gasoline sales until the mid–1980's. He acted as a coordinator between suppliers and distributors of the gasoline. As noted above, Balagula controlled many of the unlicensed companies which purchased gasoline from NYFT, including EMA (until approximately the end of November 1986), and Batuner and Varzar allegedly operated many of the unlicensed companies which purchased gasoline from NYFT.

The Macchia Indictment further alleges that the Macchias formed holding and management companies which leased and managed retail gasoline stations. The holding and management companies entered into contracts with the companies which operated the retail stations. These contracts gave the Macchias, through the holding and management companies, the right to designate the supplier of gasoline to the retail stations. Bootleg gasoline sold by NYFT to unlicensed companies was in turn supplied to these retail stations. M & Q Trucking Corp., owned and operated by the Macchias, delivered the bootleg gasoline to these retail stations.

Balagula and Barberio claim that the conspiracy count of the Tarricone Indictment (the "Tarricone Conspiracy") is, for double jeopardy purposes, the same conspiracy as the conspiracy in the Macchia Indictment (the "Macchia Conspiracy").

## II. DISCUSSION

### A. Double Jeopardy In Successive Conspiracy Prosecutions

■ In determining the merits of defendants' double jeopardy claims, this Court is guided by the analysis set forth by the Second Circuit in *United States v. Korfant*, 771 F.2d 660 (2d Cir.1985). As stated in *Korfant*:

In determining the merits of double jeopardy claims arising in the context of successive conspiracy prosecutions, this court has identified a number of factors as relevant to the task of individuating conspiracies. Among these factors are (1) the criminal offenses charged in successive indictments; (2) the overlap of participants; (3) the overlap of time; (4) similarity of operation; (5) the existence of common overt acts; (6) the geographic scope of the alleged conspiracies or location where overt acts occurred; (7) common objectives; and (8) the degree of interdependence between alleged distinct conspiracies.

771 F.2d at 662. "The double jeopardy claim succeeds if the offenses charged appear in fact and in law the same." *United States v. Reiter*, 848 F.2d 336, 340 (2d Cir.1988). "[O]nce a defendant introduces sufficient evidence that the two conspiracies alleged were in fact one, the burden shifts to the government to rebut the inference of unity." *United States v. Papa*, 533 F.2d 815, 821 (2d Cir.), *cert. denied*, 429 U.S. 961, 97 S.Ct. 387, 50 L.Ed.2d 329 (1976). This Court must consider these factors in light of the totality of the circumstances presented. *Reiter*, 848 F.2d at 340.

### B. Application of the Korfant Factors

■ Defendants point to the overlap of participants, time frame and geographic scope of the conspiracies, and to the similarity of the methods of operation of the conspiracies. In addition, both indictments charged conspiracy to evade federal gasoline excise taxes. The defendants arguably have made a sufficient showing under the *Korfant* factors to shift the burden to the government to prove distinct conspiracies. However, the government has rebutted any inference of unity. Application of the *Korfant* factors to the totality of the circumstances demonstrates that the Tarricone Conspiracy and Macchia Conspiracy are distinct conspiracies as a matter of fact and law.

A significant factor in this Court's determination is the relative independence of the two conspiracies. Contrary to defendants' contention that the Tarricone Indictment carved out a portion of a single overriding conspiracy (*i.e.*, the Macchia Conspiracy), it appears from consideration of the indictments, the record in the Tarricone trial, and the briefs submitted on this motion that the operation of the Tarricone Conspiracy did not depend on the operation of the ongoing, substantially larger Macchia Conspiracy and was not merely a part of the Macchia Conspiracy.

The fact that ATI and Conlo were used in both conspiracies does not make the Tarricone Conspiracy part of the Macchia Conspiracy. In the Tarricone Conspiracy, ATI was the source of the bootlegged gasoline and it was ATI's liability that was evaded. In the Macchia Conspiracy, ATI was not a source of gasoline but was used on false invoices and book transfers to make it appear that NYFT sold gasoline to ATI, while no such sales actually occurred. As for Conlo, the record in the Tarricone trial shows that Pabone and Quock purchased the Conlo license to effect the Conlo/Beck daisy chain scheme in December 1985, and thereafter sought a source of supply of gasoline and a means of distribution. On the other hand, the Macchia Indictment does not allege any book transfers involving Conlo after March 1984 (a date prior to the start of the Tarricone Conspiracy), and, according to the government, NYFT did not invoice Conlo after December 1985 (the date Pabone and Quock purchased Conlo for use in the scheme to evade ATI's taxes). As the government contends, had the Conlo/Beck scheme of the Tarricone Conspiracy been part of the Macchia Conspiracy, Pabone and Quock would not have needed to locate a source of supply and a means of distribution. These apparently were already in place and implemented in the ongoing Macchia Conspiracy.

Although there is some overlap of individuals and companies involved in the two conspiracies, this overlap does not transform these separate conspiracies into one. The differences in participants and the differences in the roles played by those involved in both conspiracies makes the overlap of players less significant. The Macchias, who appear to be central players in the Macchia Conspiracy, were not even mentioned in the Tarricone case. Nor was there any mention of NYFT or defendants Varzar or Batuner in the Tarricone case. Moreover, there was no mention at trial of bootlegged gasoline going through NYFT and its related corporations.

The gasoline involved in the Tarricone Conspiracy was delivered to various terminals and stored in throughput accounts under the names of Beck, HOB and Shoreco. None of the gasoline was delivered to the Macchias' M & Q terminal.

Although Balagula participated in both conspiracies, his involvement with HOB and EMA in the Tarricone Conspiracy does not appear to have been part of the Macchia Conspiracy. Moreover, notwithstanding the testimony in the Tarricone trial that Balagula "controlled one-hundred percent of the New York City sales ... of the bootlegged gas,"[2] as the Second Circuit has recognized, a single person can be the head of two separate distribution chains of two separate conspiracies. See, e.g., Papa, 533 F.2d at 822 ("[Defendant] was the director of two unrelated chains distributing narcotics; the mere fact that he supervised each chain does not transform two separate conspiracies into one."); Reiter, 848 F.2d at 341; Korfant, 771 F.2d at 663. Thus, even if Balagula controlled the supply of bootlegged gasoline in the New York City area, this fact would not transform the Tarricone and Macchia Conspiracies into one. In any event, it is not clear that Balagula controlled the activities of the Macchia Conspiracy; nor does the Macchia Indictment allege or suggest that Balagula exercised such control. Similarly, although Barberio participated in both conspiracies, he functioned in different capacities in the two conspiracies. In the Macchia Conspiracy, Barberio was as an employee of NYFT, while in the Tarricone Conspiracy he was an employee of Shoreco and WHPC.

As for the operations of the two conspiracies, the mere fact that both conspiracies used the same *modus operandi* (*i.e.*, a daisy chain scheme involving "burn companies" to evade federal gasoline excise taxes) does not make the conspiracies one. This similarity is far outweighed by the differences in the operations of the two conspiracies. One such significant difference is that the Macchia

---

**2.** This testimony was admitted as evidence of Balagula's knowledge and intent under Fed. R.Evid. 404(b). This ruling was upheld by the Second Circuit in Balagula's appeal from his conviction. Quock had also testified that Balagula "was selling about $10 million gallons in [New York] City" and that "[t]he whole volume for the City was 10 million with Marat [Balagula] at that time." Quock claimed that Balagula arranged for the supply of gasoline through ATI for the Conlo/Beck daisy chain scheme that Pabone and Quock had put together.

Conspiracy involved gasoline supplied only by NYFT, whereas all the gasoline in the Tarricone Conspiracy was supplied by ATI. The Macchia Conspiracy involved the use of false invoices stating that NYFT sold gasoline to approximately 18 licensed companies, whereas the Tarricone Conspiracy involved false invoices from ATI to Conlo alone. While Conlo was one of the 18 licensed companies used in the NYFT scheme, the Macchia Indictment does not allege any book transfers involving Conlo after March 1984. As noted above, the Tarricone defendants did not use Conlo to effectuate the Conlo/Beck daisy chain (by using the Conlo license to acquire tax-free gasoline from ATI) until after the Conlo license was acquired by Pabone and Quock in December 1985, at which point Conlo was no longer used in the Macchia Conspiracy to avoid NYFT's excise tax. Conlo was then used in the Tarricone Conspiracy to hide ATI's excise tax liability for some 21 barges of gasoline distributed by ATI. Beck was never used in any capacity in the NYFT scheme. In short, both conspiracies had a full complement of players, and the actual and contrived transactions to effect each of the schemes do not indicate that one conspiracy was part of the other or that one conspiracy could not operate without the other.

A comparison of the overt acts charged in the Macchia Indictment to those in the Tarricone Indictment indicates no common overt acts. The overt acts charged in the Tarricone Conspiracy dealt with the supply of gasoline from a different source than in the Macchia Conspiracy, with the evasion of the tax liability of a different company than in the Macchia Conspiracy, and concealed by different "burn" companies (Conlo and Beck as then owned by Pabone and Quock) than used in the Macchia Conspiracy. The overt acts charged in the Tarricone Indictment do not appear to be the result of the government's "carving out" a narrower conspiracy from a larger, ongoing one (i.e., the Macchia Conspiracy), as they relate solely to the perpetration of the Conlo/Beck daisy chain scheme to evade ATI's tax liability. They are not part of a scheme to evade NYFT's tax liability.

Merely because two separate conspiracies concerning the evasion of tax on gasoline occurred in the same general geographic area, i.e., the New York/New Jersey Metropolitan area, does not make them the same conspiracies for double jeopardy purposes. This geographic area certainly is large enough to support two separate, and for nearly one year simultaneous, conspiracies involving bootleg gasoline, as it apparently did here. See, e.g., United States v. Mallah, 503 F.2d 971, 983 (2d Cir.1974), cert. denied, 420 U.S. 995, 95 S.Ct. 1425, 43 L.Ed.2d 671 (1975) ("New York City is large enough to harbor two simultaneous narcotics conspiracies...."). In fact, the Tarricone Conspiracy involved barge loads of gasoline bought by ATI in New Jersey and transported to terminals in New Jersey, Brooklyn, Westchester and Long Island, but not to the Macchia's M & Q terminal in Brooklyn. The gasoline transactions in the Macchia Conspiracy allegedly occurred primarily in the M & Q terminal in Brooklyn, New York, and all of the gasoline was supplied by NYFT.

As for the objectives of the two conspiracies, each was different: the Tarricone Conspiracy sought to evade the excise tax liabilities for ATI, whereas the Macchia Conspiracy sought to evade the excise tax liabilities for NYFT. Accordingly, this Court disagrees with defendants' contention that the objectives were the same because there was "one unified goal," i.e., "to cheat on excise taxes and to make as much money for the participants," Tr. Oral Arg. 53.

In sum, under the totality of the circumstances, notwithstanding that there is some overlap in time, place and participants of the two conspiracies, and both indictments charged conspiracy to evade federal gasoline excise taxes, these similarities are far outweighed by the differences in operations, overt acts and objectives of the two conspiracies, and the relative independence of the two conspiracies. The similarities do not alter this Court's determination that the two conspiracies appear to be distinct as a matter of law and fact.

## CONCLUSION

For the reasons above, Count One of the Superseding Indictment is not barred under

the double jeopardy clause. Accordingly, the motions by defendants Balagula and Barberio to dismiss Count One of the Superseding Indictment on the grounds of double jeopardy are denied.

SO ORDERED.